FILED
2026 Sep-17 AM 10:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

**DAMIEN R. POINTER,**
Plaintiff,

**v.**

**FRANK BISIGNANO,**
**Commissioner of the Social Security Administration,**
Defendant.

**Case No. 4:25-cv-1090-CLM**

# MEMORANDUM OPINION

Damien R. Pointer seeks disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") from the Social Security Administration ("SSA") based on several impairments. The SSA denied Pointer's application in an opinion written by an Administrative Law Judge ("ALJ"). The SSA's Appeals Council then denied Pointer's request for review.

Pointer argues: (1) that the Appeals Council wrongfully refused to consider new evidence that he submitted to it, and (2) that once the evidence submitted to the Appeals Council is considered, the ALJ's decision isn't supported by substantial evidence. For the reasons stated within, neither the Appeals Council nor the ALJ reversibly erred.

## I. Statement of the Case

### A. Pointer's disability, as told to the ALJ

Pointer was 38 on his alleged disability onset date. (R. 253). In 2021 and 2022, Pointer worked at Tyson Foods weighing trucks and recording the relevant information. (R. 72–73, 80). But Pointer says he was fired for sleeping and missing days due to his health conditions. (R. 73).

According to Pointer's disability report, he suffers from a burst fracture t5-t6 in spine, spinal injury from gunshot wound, nerve damage in spine, depression, and anxiety. (R. 306). And during the ALJ hearing, Pointer testified that he cannot work because of the injuries from his gunshot wound. (R. 77). Pointer says that the gunshot wound, which he suffered in April 2021, has caused arthritis in his left shoulder, back pain, numbness in his right leg, tingling, nerve damage, post-traumatic stress disorder, depression, and difficulty walking. (*Id.*).

Pointer testified that he is always in pain and rated his pain a 6/10 on the pain scale. (R. 78). And the furthest Pointer says he can walk is to the mailbox. (*Id.*). Pointer also noted that he sleeps well at night when he is heavily medicated. (R. 79).

Pointer lives in a house with his girlfriend who is disabled. (R. 75–76). Pointer says he is very limited in his ability to do any household duties and that he mostly uses the microwave to cook. (R. 78).

### B. Determining Disability

The SSA has created the following five-step process to determine whether an individual is disabled and thus entitled to benefits under the Social Security Act:

| The 5-Step Test | | |
|---|---|---|
| Step 1 | Is the Claimant engaged in substantial gainful activity? | If yes, claim denied.<br>If no, proceed to Step 2. |
| Step 2 | Does the Claimant suffer from a severe, medically-determinable impairment or combination of impairments? | If no, claim denied.<br>If yes, proceed to Step 3. |
| Step 3 | Does the Step 2 impairment meet the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1? | If yes, claim granted.<br>If no, proceed to Step 4. |

| **Determine Residual Functional Capacity** | | |
|---|---|---|
| Step 4 | Does the Claimant possess the residual functional capacity to perform the requirements of his past relevant work? | If yes, claim denied.<br>If no, proceed to Step 5. |
| Step 5 | Is the Claimant able to do any other work considering his residual functional capacity, age, education, and work experience? | If yes, claim denied.<br>If no, claim granted. |

*See* 20 C.F.R. §§ 404.1520(a), 404.1520(b) (Step 1); 20 C.F.R. § 404.1520(c) (Step 2); 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526 (Step 3); 20 C.F.R. § 404.1520(e-f) (Step 4); 20 C.F.R. § 404.1520(g) (Step 5).

As shown by the gray-shaded box, there is an intermediate step between Steps 3 and 4 that requires the ALJ to determine a claimant's "residual functional capacity," which is the claimant's ability to perform physical and mental work activities on a sustained basis.

### C. Pointer's Application and the ALJ's Decision

The SSA reviews applications for benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1-4).

Pointer applied for a period of disability, DIB, and SSI in August 2022. After receiving an initial denial in March 2023, Pointer requested an ALJ hearing, which was held in May 2024. Later that month, the ALJ issued an opinion denying Pointer's claims. (R. 44–54).

Pointer's alleged disability onset date was April 2021. But Pointer worked at substantial gainful activity levels from February until June 2022. Even so, because Pointer was not engaged in substantial gainful

activity at the time of the ALJ hearing, the ALJ found at Step 1 that Pointer's claims could proceed to Step 2.

At Step 2, the ALJ determined Pointer suffered from the following severe impairments: posttraumatic arthritis of the left shoulder, nerve damage to the right leg, and hypertension. The ALJ determined that Pointer's mental impairments, including his PTSD, bipolar disorder, and depression, were non-severe.

At Step 3, the ALJ found that none of Pointer's impairments, individually or combined, met or equaled the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. So the ALJ next had to determine Pointer's residual functional capacity.

The ALJ determined that Pointer had the residual functional capacity to perform a range of light work with these added limitations:

- Pointer can occasionally climb ramps and stairs.
- Pointer cannot climb ladders, ropes, or scaffolds.
- Pointer cannot balance.
- Pointer can frequently stoop but not crawl.
- Pointer can occasionally kneel and crouch.
- Pointer cannot push leg controls with his right lower extremity.
- Pointer cannot experience excessive vibration.
- Pointer can occasionally overhead reach with his non-dominant left upper extremity.
- Pointer needs a sit/stand option at one-hour intervals for a duration of five minutes while remaining on task.

- Pointer should have no more than occasional work related interaction with the general public.

At Step 4, the ALJ found that Pointer could perform his past relevant work as a weight recorder at Tyson. Thus, the ALJ did not proceed to Step 5 of the five-step process.

### D. Appeals Council Decision

Pointer requested an Appeals Council review of the ALJ's decision. As part of Pointer's request for review, Pointer submitted a psychological assessment and mental health source statement from Dr. June Nichols, a consultative examiner. (R. 60–67). The Appeals Council denied Pointer's request for review, finding that this newly submitted "evidence does not show a reasonable probability that it would change the outcome" of the ALJ's decision. (R. 1–3).

## II. Standard of Review

This court's role in reviewing claims brought under the Social Security Act is narrow. In reviewing the ALJ's decision, the scope of the court's review is limited to (a) whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g), and (b) whether the ALJ applied the correct legal standards, *see Stone v. Comm'r of Soc. Sec.*, 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford*, 363 F.3d at 1158.

In deciding whether the Appeals Council erroneously refused to consider newly submitted evidence, the court applies a de novo standard of review. *See Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1321 (11th Cir. 2015).

## III. LEGAL ANALYSIS

Pointer argues that (a) the Appeals Council erred in finding no reasonable probability that the new evidence from Dr. Nichols would change the outcome of the ALJ's opinion, and (b) once Dr. Nichols' psychological assessment and mental health source statement are considered, the ALJ's decision isn't supported by substantial evidence. The court will address each argument in turn.

### A. New Evidence to Appeals Council

The Appeals Council will review an ALJ's decision if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." *See* 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5). According to Pointer, the evidence from Dr. Nichols is new, chronologically relevant evidence, and there is a reasonable probability that the ALJ would find that this evidence showed that Pointer's mental impairments were severe.

1. *Background*: Dr. Nichols completed her psychological assessment and mental health source statement in January 2025—*i.e.*, around six months after the ALJ issued her hearing decision. The psychological assessment is based on Dr. Nichols' review of Pointer's medical records, Pointer's subjective statements about his symptoms, and a January 2025 mental status examination. (R. 60–66). According to Dr. Nichols' mental status examination findings, Pointer arrived to the interview "neatly dressed" and had "fair" eye contact. (R. 63). But Pointer twisted his hands and fidgeted throughout the interview. (*Id.*). Pointer's speech was clear and slow. (*Id.*). And Pointer's mood was dysthymic but congruent with thought processes. (*Id.*). Pointer's affect was anxious/very guarded, and he reported that he was having trouble sleeping. (*Id.*). Pointer also reported that he doesn't enjoy much anymore, rarely leaves the house, and many days stays in bed. (*Id.*). But Pointer denied suicidal or homicidal ideation, had a clear stream of consciousness, and was oriented to person, place, time, and situation. (*Id.*).

Pointer's thought processes were within normal limits, and there was no evidence of confusion, loose associations, tangentiality, flight of ideas, or thought blocking. (*Id.*). Pointer's conversation pace was within normal limits, though his thought content was positive for hallucinations, such as seeing shadow people and hearing his name called or a conversation that he can't quite hear. (*Id.*). Pointer denied obsessions or compulsions but confirmed panic attacks and reported that he isn't comfortable walking up to a group of people. (*Id.*). While Pointer's judgment and insight were good, he was found to be functioning in the low range of intellectual abilities. (*Id.*). Dr. Nichols also found that Pointer's speed of mental processing was adequate, his memory function was grossly intact, his general fund of knowledge was fair, and his thinking was concrete in nature. (*Id.*). In summarizing her mental status examination findings, Dr. Nichols recognized that Pointer initially maintained employment while seeking help. (R. 64). But she said that the 2021 shooting "appears to have caused a significant change," and that when Pointer returned to work, he couldn't concentrate to do the job. (*Id.*).

Dr. Nichols diagnosed Pointer with post traumatic stress disorder and bipolar disorder, depressed mood, severe with psychotic features. (R. 66). And in both her psychological assessment and mental health source statement, Dr. Nichols found that while Pointer can understand, remember, or carry out very short and simple instructions, he cannot maintain attention, concentration, and/or pace for periods of at least two hours. (R. 66–67). Dr. Nichols also found that Pointer cannot: (1) perform activities within a schedule and be punctual with customary tolerances; (2) sustain an ordinary routine without special supervision; or (3) adjust to routine and infrequent work changes. (*See id.*). Nor did Nichols find Pointer able to interact with supervisors and co-workers or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*See id.*). Dr. Nichols also determined that Pointer would be off task around 45% of the time during an eight-hour workday. (*See id.*). Finally, Dr. Nichols said that she would expect Pointer to fail to report to work 15-20 days out of a 30-day period. (*See id.*). According to Dr. Nichols, these limitations relate back to April 2021. (*See id.*).

2. *Reasonable Probability*: The Appeals Council considers new, chronologically relevant evidence only if there is a reasonable probability that this evidence would change the administrative result. *See Washington*, 806 F.3d at 1321. For four reasons, the court rejects Pointer's argument that Dr. Nichols' psychological assessment and mental health source statements would have changed the result here.

First, Dr. Nichols' opinions aren't consistent with her mental status examination findings. For example, Dr. Nichols states that Pointer cannot adhere to basic standards of neatness and cleanliness. (R. 66–67). But Dr. Nichols reported that Pointer arrived to his examination "neatly dressed." (R. 63); *see also Minton v. Soc. Sec. Admin., Comm'r*, 2025 WL 3213390, at *4 (11th Cir. Nov. 18, 2025) (noting contradiction between Dr. Nichols' observation that claimant was neat and clean during examination and finding that he couldn't adhere to basic standards of neatness and cleanliness). Dr. Nichols' determination that Pointer can only understand, remember, and carry out simple instructions also contradicts her findings that Pointer has grossly intact memory functions and was able to recount his personal history in detail. (R. 63, 66–67). The ALJ would not likely find these internally inconsistent findings persuasive.

Second, Dr. Nichols provides no explanation for the extreme limitations that she has found. The mental health source statement is a one-page, pre-printed questionnaire that answers yes or no questions and does not reference any supporting medical records or assessments. (R. 67). And while Dr. Nichols says the opinions in the psychological assessment are "[b]ased on the medical records reviewed, [Pointer's] interview and the mental status examination," she does not explain why she finds that Pointer would likely be off task 45% of the time during the workday or miss 15-20 days of work in a 30-day period. (R. 66). The same is true for each enumerated limitation. "That's a problem" because without any explanation for the rationale behind Dr. Nichols' conclusions the court "can't tell whether the medical records support the limitations or are otherwise consistent with them." *Spurgeon v. Soc. Sec. Admin., Comm'r*, 2024 WL 1395258, at *7 (11th Cir. Apr. 2, 2024).

Third, while the basis for Dr. Nichols' opinions is unclear, she says that she at least partly relied on the medical documentation in the record. Thus, the ALJ considered much of the same evidence that Dr. Nichols did yet determined that Pointer's mental impairments weren't severe or disabling. And though Pointer says that Dr. Nichols' findings are consistent with CRNP Kasey Gross's April 2024 mental status exam, (R. 570–74), that records the ALJ reviewed are consistent with Dr. Nichols' findings fails to show a reasonable probability that the ALJ would change her decision, *Minton*, 2025 WL 3213390, at *5. In other words, the Appeals Council does not err in declining to review evidence that is "cumulative of the evidence before the ALJ." *See Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 785 (11th Cir. 2014).

Dr. Nichols' findings also contradict the substantial evidence that the ALJ pointed to in support of her determination that Pointer's mental impairments were non-severe and didn't result in disabling limitations. As the ALJ noted, even after Pointer's shooting, he was able to work from February 2022 to June 2022 as a weight recorder for Tyson. (R. 47). And in his February 2023 function report, Pointer said that he didn't need any special reminders to take care of personal needs or help or reminders to take medicine. (R. 330). Pointer also reported that he did good with following written and spoken instructions, got along well with authority figures, and did good handling stress and changes in his routine. (R. 333). As for daily activities, Pointer said that he regularly went to friends' houses, the movies, and sports events when able. (R. 332). Dr. Nichols has not reconciled her opinions with this contradictory evidence, and the court cannot say that there's a reasonable probability that the ALJ would determine that Dr. Nichols' opinions undermined her reliance on this evidence in finding that Pointer was not disabled.

Fourth and finally, there's no reasonable probability that the ALJ would reach a different conclusion about Pointer's mental impairments simply because his new evidence includes opinion evidence from a consultative examiner. The SSA has implemented regulations that have done away with following a hierarchy of medical opinions. Now, an ALJ

"will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . ." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Thus, the ALJ would not need to defer to Dr. Nichols' opinions because she examined Pointer or because unlike Pointer's CED Mental Health Center providers, she is a doctor.

And Dr. Nichols' opinions contradict the State agency consultant's opinion on Pointer's mental limitations, which the ALJ found persuasive. (R. 52). In reconsidering the initial denial of Pointer's application for benefits, the State agency consultant found that Pointer (a) had no limitations in understanding, remembering, or applying information, (b) had mild limitations in interacting with others, (c) had mild limitations in concentrating, persisting or maintaining pace, and (d) had no limitations in adapting or managing oneself. (R. 103, 110). The ALJ found this opinion persuasive because it was consistent with Pointer's function report, medical records, and hearing testimony. (R. 52). For example, the ALJ noted that Pointer's ability to prepare simple meals, drive, watch television, play video games, work above and below substantial gainful activity levels, and remain socially active supported a finding that Pointer suffered from only mild mental limitations. (*Id.*). That the ALJ found the State agency consultant's opinions persuasive suggests that the ALJ would not find Dr. Nichols' contradictory opinions persuasive. *See Griffin v. Soc. Sec. Admin., Comm'r*, 842 F. App'x 339, 342 (11th Cir. 2021) ("Although a claimant may present a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence and the ultimate determination of disability is reserved for the ALJ.").

—

The court recognizes that there was not robust evidence related to Pointer's mental impairments before the ALJ. But the new evidence that Pointer presented to the Appeals Council: (1) was self-contradictory; (2) did not explain the reasoning behind Dr. Nichols' findings; (3) partly relied on evidence the ALJ had considered; and (4) contradicted evidence the

ALJ found persuasive. Thus, there is not a reasonable probability that this evidence would change the ALJ's decision, and the Appeals Council was not required to grant Pointer's request for review.

### B. Substantial Evidence

Pointer also says that when you consider Dr. Nichols' findings, the ALJ's hearing decision is not supported by substantial evidence. Because the court has found that the Appeals Council was not required to consider the evidence from Dr. Nichols, the court needn't address this argument. *See Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1310 (11th Cir. 2018); *Griffin*, 842 F. App'x at 344.

## IV. CONCLUSION

For these reasons, the court will **AFFIRM** the SSA's denial of benefits. The court will enter a separate final order that closes this case.

**Done** on September 17, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE